THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM M. BROWN, Defendant-Appellant.

Fourth District    No. 4—99—0740

Argued November 15, 2000.—Opinion filed March 6, 2001.

Daniel D. Yuhas and John M. McCarthy (argued), both of State Appellate Defender's Office, of Springfield, for appellant.

John C. Piland, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and Thomas R. Dodegge (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

In March 1999, the State charged defendant, William M. Brown, with aggravated battery of a child (720 ILCS 5/12—4.3(a) (West 1998)). In July 1999, a jury found defendant guilty of the crime charged. In August 1999, the trial court denied defendant's posttrial motion and sentenced him to 14 years' imprisonment. In that same month, the trial court denied defendant's motion to reconsider. Defendant appeals, arguing the trial court erred when it (1) admitted photographs relating to a prior incident and published them to the jury, (2) failed to place proper limits on the State's use of evidence of defendant's prior bad acts, and (3) failed to clearly answer the jury's question regarding the prior incident. We reverse and remand.

## I. BACKGROUND

In December 1997, defendant began dating Betty Ward Henderson. Betty had a child, M.J., from a previous marriage. In November 1998, Betty gave birth to a second child, W.B., defendant's son. In February 1999, Betty and defendant were living apart and the children were living with Betty.

On the evening of February 19, 1999, defendant picked up both M.J. and W.B. from Betty's residence. The following morning, defendant called Betty and informed her M.J.'s leg was hurt. Defendant explained M.J. had gotten her leg caught between a bed and a wall, and she was not able to walk on her leg. Later in the morning, defendant returned the children to Betty. As the day went on, M.J. began to run a fever and appeared to experience greater pain. On Sunday morning, Betty, defendant, and defendant's mother, Helen Carol Brown (Carol), took M.J. to the emergency room at Carle Hospital (Hospital). According to Betty, she decided to tell the doctors M.J. was with her the night the leg was injured based on a conversation with Carol. Jon Hendrickson, M.D., examined the X rays taken of M.J.'s leg and determined she had a fracture in her right lower tibia.

Betty, defendant, and the children returned to the Hospital the next day for M.J. to receive follow-up care. While at the Hospital, a Department of Children and Family Services (DCFS) caseworker, Stephen Keith Sizemore, informed Betty and defendant he was removing the children from their care. Betty and defendant returned to Betty's residence, whereupon Roy Akers, her uncle, informed her DCFS caseworker Sizemore was coming to meet with them. Defendant promptly left. Betty told the police officer who accompanied Sizemore that M.J. was with her the night of the injury. Later, Sizemore went to defendant's residence and interviewed defendant about the injury. Defendant initially denied seeing the children within the past week.

Eventually, defendant stated M.J. had spent the night at his residence and caught her leg between the wall and the mattress.

The State later charged Betty with obstruction of justice for stating M.J. was in her care at the time of the injury, when in fact M.J. was with defendant. Betty pleaded guilty, and a trial court sentenced her to probation.

The State later charged defendant with aggravated battery of a child. In April 1999, the State made a motion *in limine* seeking the admission of evidence regarding the circumstances surrounding a prior incident on September 13, 1998 (September 1998 incident), involving defendant and M.J. In July 1999, the trial court held a hearing on the State's motion. Defense counsel opposed the introduction of any evidence of the earlier incident, arguing its prejudicial effect far outweighed any probative value. The trial court ruled the evidence of the September 1998 incident was admissible to show intent and the absence of an accident. When defense counsel asked what evidence would be allowed regarding the September 1998 incident, the trial court responded "[t]hey [could] bring in all, any and all testimony concerning that matter."

In July 1999, the trial court held a jury trial on the State's charge against defendant. At trial, Theresa Ward, M.J.'s maternal grandmother, testified she took M.J. to the Hospital emergency room on September 14, 1998, because M.J. had severe bruising on her face and buttocks. The bruising appeared after M.J. had been left in defendant's care. Theresa confronted defendant about the bruising, and defendant admitted he had spanked M.J. Theresa also identified various photographs of M.J. taken at the Hospital after the September 1998 incident. Theresa also described another incident in which M.J. began screaming when alone in a hallway with defendant.

William Gemme shared a trailer with defendant in September 1998. Gemme testified as follows. On September 13, 1998, Betty brought M.J. to the trailer and left her in defendant's care. When Betty left the trailer, M.J. screamed, and defendant picked her up by the arm and spanked her. Gemme also witnessed M.J. hit her head on the metal part of the couch as well as fall off the couch and hit her head on a floor vent. Gemme identified photographs of the trailer taken after the September 1998 incident.

Officer James D. Reynolds testified he was called to the Hospital emergency room on September 14, 1998, to investigate the alleged abuse of M.J. Officer Reynolds stated M.J. had bruises on her face, back, and buttocks. Officer Reynolds identified photographs he had taken of M.J.'s injuries. On September 15, 1998, Officer Reynolds interviewed defendant about the incident. A tape recording of the

interview was played for the jury, and the jurors received a transcript of the interview. Defense counsel objected to this witness' testimony because it was cumulative.

Roy Akers, Theresa's brother and Betty's uncle, testified Betty and the children were living with him in February 1999. Akers testified M.J. would throw fits when left alone with defendant. He also testified he saw M.J. the evening of February 18, 1999, and she was walking fine and had no marks or bruises on her face. Akers was present when defendant brought the children home. M.J. had a red mark on her forehead and cheek and was favoring her right leg. According to Akers, defendant told him M.J. had gotten her leg trapped between the bed and the wall, and defendant had released M.J.'s leg.

Joanne Dawson, Akers' roommate in February 1999, testified she did not observe any injuries when she changed M.J.'s diaper the morning of February 19, 1999. Dawson stated the next day M.J. cried when she put weight on her leg.

Jason Davis, defendant's roommate in February 1999, testified defendant returned home on Friday evening with M.J. and her brother. Davis did not notice anything unusual with M.J. before he left for the night. When Davis returned home the next morning, defendant explained to him M.J. had gotten her leg caught between the wall and mattress and had gotten a charley horse. Defendant also explained M.J. had gotten a bruise from falling down some stairs. On Saturday morning, Davis never saw M.J. attempt to walk.

Sizemore, a DCFS caseworker, went to the Hospital on February 22, 1999, to investigate alleged abuse of M.J. based on a hot-line tip. Sizemore spoke with the doctors and nurses and observed M.J. had bruises on her face and her leg was in a cast. Sizemore placed M.J. and her brother in protective custody. Later in the day, Sizemore spoke individually with both Betty and defendant, as well as Akers. He testified as to what transpired during the two interviews. During the interview with defendant, defendant originally denied having contact with M.J. but eventually stated M.J. stayed at his apartment and, when her legs became tangled between the bed and the wall, he simply straightened them out.

Betty testified to the circumstances surrounding the September 1998 incident and the February 1999 incident. She admitted originally lying to doctors and investigators regarding the February 1999 incident. She also explained her sentence on the obstruction of justice charge. As to the September 1998 incident, she stated she left M.J. with defendant and, when she returned, M.J. had bruises on her face. Defendant explained M.J. had fallen into a bed rail and a doorframe. Later, Betty noticed bruises on M.J.'s buttocks. Defendant then told her he had spanked M.J.

Malcolm Hill, M.D., a pediatrician, testified he examined M.J. on September 14, 1998, and found several bruises on the child's face and buttocks. Hill examined and discussed the photographs of M.J. and the trailer. In his opinion, the bruises on the buttocks and cheek were a result of abuse. Some of the other bruises could have been caused by a fall.

Jon Hendrickson, M.D., a diagnostic radiologist, testified he had examined the X rays of M.J.'s right leg and determined she had a non-displaced fracture of the lower tibia.

Alan Richey, a court reporter, read the statement of defendant at a February 24, 1999, proceeding involving W.B. and M.J. Defendant had stated:

"I know that on my behalf I did not hurt [M.J.] I had her over the weekend of the 22 or 21, whatever it was. That I did notice that she was between the wall and the bed. I proceeded to take her out. And the next morning that's when I noticed that she was not walking like she was yesterday, or the day before. And that's when I contacted Ms. Ward at her uncle's residence. And that is when I took both [W.B.] and [M.J.] back to her mother's or uncle's residence around two o'clock that afternoon."

Mary Kathleen Buetow, M.D., a pediatrician and a member of the Hospital's child protection team, testified on February 22, 1999, Donna Beck, M.D., asked her to evaluate M.J. Both defendant and Betty were present during Buetow's evaluation. Buetow testified Betty stated M.J. was sleeping in bed with her when Betty noticed M.J.'s foot had become wedged between the bed and the wall. Betty straightened the foot out and M.J. remained asleep. Moreover, Buetow testified defendant stated M.J. had been injured in September 1998 and there was concern he was the person responsible for her injuries. Defendant stated the injuries were caused by his roommate, Gemme.

Buetow testified M.J.'s fracture was a "spiral fracture," a twisting-type fracture, the result of some rotational force. Such a fracture could occur if an individual twisted a child's extremity. According to Buetow, any type of fracture would cause considerable pain and, if the incident occurred as Betty described it, M.J. would have awakened and cried. Buetow also viewed the pictures of M.J. after the September 1998 incident and concluded the bruises were not caused by an accidental fall. Based on her evaluation of M.J. in February 1999, the history of the September 1998 incident, and the pictures of M.J., Buetow made a diagnosis of child abuse.

At the close of the State's evidence, the trial court admitted, over defendant's objection, the photographs of M.J. after the September 1998 incident and those of the trailer where defendant was living at

the time of the incident. Defendant objected to each photograph as cumulative. The trial court allowed all photographs, except an old picture of defendant, to go to the jury room.

Defendant presented the testimony of Milton R. Carlson, M.D., an orthopedic surgeon. Carlson testified the type of fracture sustained by M.J. was common in children. According to Carlson, such a fracture could be caused by a fall or twisting injury during play, a dog bite, or falling off a bike. The fracture could have also occurred as described by defendant or by a person twisting a child's leg. However, Carlson felt the fracture would have caused immediate pain and the child would have begun crying immediately.

Defendant also presented the evidence of Carol, his mother. She testified her apartment was next door to defendant's and the common wall between the apartments was thin. She stated she could hear conversations next door and did not hear M.J. cry the night of February 19, 1999. She also stated she saw M.J. standing Saturday, February 20, 1999, and M.J. was not crying.

During jury deliberations, the jury posed this question: "Can we convict on this charge based on the [September 1998] incident?" The prosecutor asserted the jury should be referred to the instructions and defense counsel argued the answer should be "no." The trial court gave the following response: "You have an instruction concerning the [September 1998] incident, 'conduct other than that charged in the information.' You must follow."

The jury found defendant guilty. The trial court denied defendant's posttrial motion, sentenced defendant to 14 years' imprisonment, and later denied defendant's motion to reconsider. This appeal followed.

## II. ANALYSIS

### A. Evidence of Defendant's Prior Bad Acts

■ Defendant first contends the trial court erred by allowing the State to present a large amount of evidence about the September 1998 incident. Defendant now concedes some evidence of the 1998 incident was admissible to show his intent, knowledge, and the absence of accident in the February 1999 incident. The decision whether to admit cumulative evidence rests within the sound discretion of the trial court, and this court will not interfere with the trial court's exercise of its discretion absent a showing of abuse prejudicial to defendant. *People v. Wilson*, 271 Ill. App. 3d 943, 947, 649 N.E.2d 1377, 1381 (1995).

### 1. *Preserving the Issue of Testimony on September 1998 Incident*

■ We note defendant only made a cumulative objection to the

photographic evidence at trial, not the testimony of any witnesses. A specific objection to the admission of evidence waives all grounds not specified. *People v. Moore*, 171 Ill. 2d 74, 114, 662 N.E.2d 1215, 1233 (1996). In his posttrial motion, defendant raised the admissibility of the September 1998 incident and the "trial within a trial *** including photos and police testimony." Defendant now acknowledges some evidence of the September 1998 incident was admissible but argues the State presented too much evidence on it. However, we recognize defendant may have improperly relied on the trial court's statements in granting the motion in limine. Defense counsel inquired: "Are they going to be allowed to bring in this evidence as [*Wilson v. Clark*, 84 Ill. 2d 186, 417 N.E.2d 1322 (1981),] sort of evidence that the doctors rely upon it, or are they going to be able to bring all the police in back from September and basically try that case as well?"; the trial court responded, "[t]hey can bring in all, any and all testimony concerning that matter."

■ Trial courts should carefully analyze a motion *in limine. Cunningham v. Millers General Insurance Co.*, 227 Ill. App. 3d 201, 205, 591 N.E.2d 80, 83 (1992). Such rulings have a major impact on the subsequent trial. Because the trial court rules on a motion *in limine* before hearing the full evidence at trial, trial courts should be cautious in making broad rulings on motions *in limine. Cunningham*, 227 Ill. App. 3d at 205, 591 N.E.2d at 83.

■ Here, defendant preserved his objection by questioning the breadth of the trial court's ruling at the hearing on the State's motions *in limine* and including it in his posttrial motion. To preserve an issue for appeal, the defendant must have raised the issue in a motion *in limine* or an objection at trial and also in a posttrial motion. *People v. Cruzado*, 299 Ill. App. 3d 131, 140, 700 N.E.2d 707, 714 (1998); *People v. Hudson*, 157 Ill. 2d 401, 434-35, 626 N.E.2d 161, 175 (1993); *People v. Mason*, 274 Ill. App. 3d 715, 721, 653 N.E.2d 1371, 1375 (1995).

### 2. *No Minitrials on Other-Conduct Evidence*
■ In the case of other-conduct evidence, the Supreme Court of Illinois has advised against conducting minitrials on the other conduct. *People v. McKibbins*, 96 Ill. 2d 176, 186-87, 449 N.E.2d 821, 826 (1983). The trial court should carefully limit evidence of other conduct to evidence relevant to the issue on which the other conduct is admitted. *People v. Bartall*, 98 Ill. 2d 294, 315, 456 N.E.2d 59, 69 (1983). Cumulative evidence of other conduct can overpersuade the jury to convict the defendant as a bad person, rather than because he was guilty of the crime charged. *People v. Olson*, 96 Ill. App. 3d 193, 198-99, 420 N.E.2d 1161, 1165 (1981).

In this case, we conclude the State did more than conduct a mini-trial on other-conduct evidence: it switched the focus of the trial to the prior incident. The testimony of 4 of the State's 12 witnesses focused solely on the September 1998 incident. The testimony of two other witnesses discussed both the September 1998 and February 1999 incidents. Much of the testimony on the September 1998 incident was repetitive. In total, the State put on 12 witnesses, 6 of whom testified about the September 1998 incident.

Since our confidence in the verdict is undermined by several aspects of the trial, we need not decide whether the admission of cumulative evidence constituted plain error.

## B. Admissibility of Photographs

At the conclusion of the State's case, the trial court admitted photographs of M.J. and defendant's trailer after the September 1998 incident. At trial, defense counsel objected to these pictures on various grounds, arguing the photographs were either irrelevant, too prejudicial, or cumulative. In his posttrial motion, defendant argued the trial court erred in admitting the photographs because they had little probative value and "had the prejudicial impact of inflaming the passion and prejudice of the jury." On appeal, defendant argues the trial court erred in admitting the photographs because their probativeness is outweighed by their prejudice. Evidentiary rulings are within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *People v. Reid*, 179 Ill. 2d 297, 313, 688 N.E.2d 1156, 1164 (1997).

The photographs of M.J. and defendant's trailer relate to defendant's conduct in the September 1998 incident. The photographs of M.J. showed extensive bruising, and the photographs of the trailer showed the couch on which defendant claimed M.J. hit her head. The pictures are clearly relevant to the issues of defendant's intent, knowledge, and absence of mistake in the February 1999 incident. Such evidence of other conduct is admissible to prove *modus operandi*, intent, identity, motive, absence of mistake, or any relevant purpose other than to show defendant's propensity to commit crime. *People v. Summers*, 202 Ill. App. 3d 1, 17, 559 N.E.2d 1133, 1143 (1990). However, photographs are inadmissible when "their nature is so prejudicial and so likely to inflame the jurors' passions that their probativeness is outweighed." *People v. Henderson*, 142 Ill. 2d 258, 319, 568 N.E.2d 1234, 1263 (1990).

Defendant cites *People v. Davis*, 97 Ill. 2d 1, 452 N.E.2d 525 (1983), and *People v. Brisbon*, 106 Ill. 2d 342, 478 N.E.2d 402 (1985), in support of his argument. The Supreme Court of Illinois in both *Davis* and

*Brisbon* declared photographs of murder victims inadmissible in hearings under section 9—1(b) of the Criminal Code of 1961 (720 ILCS 5/9—1(b) (West 1998)) because the photographs were unnecessary and prejudicial. *Davis,* 97 Ill. 2d at 29, 452 N.E.2d at 538; *Brisbon,* 106 Ill. 2d at 371, 478 N.E.2d at 415.

The present case is more similar to our decision in *Summers* than the death penalty cases cited by defendant. In *Summers,* 202 Ill. App. 3d at 18, 559 N.E.2d at 1143, this court concluded evidence of defendant striking the head of the deceased's brother at a time reasonably contemporaneous with the blows defendant allegedly struck against the deceased, causing his death, was probative of defendant's state of mind as he performed the acts. This evidence included photographs of the brother taken the day of the deceased's death. *Summers,* 202 Ill. App. 3d at 17, 559 N.E.2d at 1143. This court held the trial court did not abuse its discretion in admitting the photographs. *Summers,* 202 Ill. App. 3d at 18, 559 N.E.2d at 1144.

■ In this case, the photographs were probative of the issue of abuse in the September 1998 case. The pictures illustrated the injuries of the child were a result of abuse, not an accident or acceptable discipline. Furthermore, the trial court, before admitting the photograph of the trailer, made sure no beer cans or other items that could be prejudicial to defendant were in the photograph. Therefore, the trial court did not abuse its discretion in admitting the photographs of M.J. and the trailer.

Defendant also argues, even if the photographs are admissible, the trial court should not have permitted them to go to the jury deliberation room. Whether photographs should be taken to the jury room is within the sound discretion of the trial court, and this court will not disturb the ruling absent an abuse of discretion to the prejudice of the defendant. See *People v. Allen,* 17 Ill. 2d 55, 62-63, 160 N.E.2d 818, 823 (1959). Defendant cites no cases where admissible photographs were not allowed to go to the jury room. 177 Ill. 2d R. 341(e)(7). We hold the trial court did not abuse its discretion in permitting the photographs to go to the jury room.

### C. Jury Instruction

■ As the State points out, the other-conduct instruction given in this case did not conform to Illinois pattern instruction No. 3.14 (Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000) (hereinafter IPI Criminal 4th)), evidently due to an inadvertent typographical omission. Defendant failed to object to the instruction at trial and did not raise the issue on appeal. However, the flaw in the instruction is a material one, and therefore we will address it. See

*Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 518, 732 N.E.2d 528, 542 (2000) (the waiver rule is a limitation on the parties and not the jurisdiction of the reviewing court).

The following jury instruction was given by the trial court at the close of evidence:

> "Evidence has been received that the defendant has been involved in conduct other than that charged in the information.
>
> This evidence has been received on the issues of the defendant's intent, knowledge, and lack of accident, and may be considered by you for that limited purpose.
>
> It is for you to determine whether the defendant was involved in that conduct and, if so, what weight should be given to this evidence on the issues of intent, knowledge, and lack of accident."

The key difference between this instruction and IPI Criminal 4th No. 3.14 is this instruction is missing the word "only" after "you" in the second paragraph ("and may be considered by you only for that limited purpose" (IPI Criminal 4th No. 3.14)).

■ The general rule provides evidence of other conduct committed by the defendant, independent of the crime for which he is being tried, is inadmissible. *People v. Velasco*, 216 Ill. App. 3d 578, 590, 575 N.E.2d 954, 962 (1991). The rationale behind the exclusion is as follows: the law distrusts the inference that, because a person committed other crimes or bad conduct, he is more likely to have committed the crime charged. *Velasco*, 216 Ill. App. 3d at 590, 575 N.E.2d at 962. While other-conduct evidence is admitted for other purposes, such as to prove *modus operandi*, intent, identity, motive, or absence of mistake (*Velasco*, 216 Ill. App. 3d at 590, 575 N.E.2d at 962), the inference is still a major concern. See *People v. Denny*, 241 Ill. App. 3d 345, 360, 608 N.E.2d 1313, 1324 (1993) (admission of other-crimes evidence risks significant prejudice to defendant). Accordingly, instructing the jury on the limited purpose for which such evidence can be considered is imperative.

■ Jury instructions should convey the correct principles of law applicable to the evidence submitted to the jury so the jury may arrive at a correct conclusion. *People v. Thomas*, 172 Ill. App. 3d 172, 177, 526 N.E.2d 467, 470 (1988). The word "only" in the second paragraph of IPI Criminal 4th No. 3.14 informs the jury the other-conduct evidence can be considered solely on the issues previously enumerated, thus informing the jury it cannot be considered for other purposes, *i.e.*, commission of a prior crime. In this case, the jury instruction on other-conduct evidence failed to convey the correct principles of law to the jury because of the omission of the word "only" in the second paragraph. This failure is evidenced by the jury's question during deliberations.

Moreover, in this case, the trial court did not instruct the jury in accordance with IPI Criminal 4th No. 3.14 prior to the introduction of the other-conduct evidence. Because other-conduct evidence poses a risk of significant prejudice to defendant, this court has suggested trial courts not only instruct the jury in accordance with IPI Criminal 4th No. 3.14 at the close of the case, but also at the time the evidence is first presented to the jury. *Denny*, 241 Ill. App. 3d at 360-61, 608 N.E.2d at 1324. The Supreme Court of Illinois has approved our suggestion. See *People v. Heard*, 187 Ill. 2d 36, 60-61, 718 N.E.2d 58, 72 (1999).

## D. Question Presented by the Jury

■ In his posttrial motion and on appeal, defendant argues the trial court erred in answering the question posed by the jury during deliberations. The State argues the trial court's answer was appropriate. A trial court's decision to answer or refrain from answering a question from the jury will not be disturbed absent an abuse of discretion. *People v. Kinney*, 294 Ill. App. 3d 903, 907, 691 N.E.2d 867, 870 (1998).

In this case, the jury posed the following question: "Can we convict on this charge based on the [September 1998] incident?" At trial and on appeal, defendant argues the trial court should have answered "no." The State suggested the instruction given adequately answered the question. The trial court gave the response quoted.

■ A trial court may exercise its discretion and properly decline to answer a jury's question where (1) the instructions are readily understandable and sufficiently explain the relevant law, (2) further instructions would serve no useful purpose or would potentially mislead the jury, (3) the jury's inquiry involves a question of fact, and (4) the giving of an answer would cause the court to express an opinion that would likely direct a verdict one way or another. *People v. Childs*, 159 Ill. 2d 217, 228, 636 N.E.2d 534, 539 (1994). However, jurors are entitled to have their questions answered. *Childs*, 159 Ill. 2d at 228, 636 N.E.2d at 539. Accordingly, even when a jury is properly instructed originally, the trial court has a responsibility to specifically and accurately instruct the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is no doubt or confusion. *Childs*, 159 Ill. 2d at 228-29, 636 N.E.2d at 539. The failure to give such an answer has been held to be prejudicial error. *Childs*, 159 Ill. 2d at 229, 636 N.E.2d at 539.

In *People v. Smith*, 296 Ill. App. 3d 435, 438, 694 N.E.2d 681, 683 (1998), the jury asked the trial court whether it had the option of downgrading to a charge of battery if the jurors all agreed the ele-

ments of aggravated battery had been proved. The defense counsel suggested the court should answer "yes," and the State suggested a "no" response should be given. *Smith*, 296 Ill. App. 3d at 438-39, 694 N.E.2d at 683-84. The trial court answered "no" to the question. *Smith*, 296 Ill. App. 3d at 439, 694 N.E.2d at 684. This court found the trial court complied with *Childs* by giving a direct response to the question. *Smith*, 296 Ill. App. 3d at 439, 694 N.E.2d at 684.

The jury's question in this case is particularly troubling because the jury asked whether it "could convict on this charged *based on* the [September 1998] incident?" (Emphasis added.) The language of the question clearly suggests the jury was having serious difficulties dealing with the concept of the limited purpose for which the other-conduct evidence was admitted. In light of the defective jury instruction and extensive other-conduct evidence, the jury's confusion is understandable.

Under these facts, the trial court had a duty to specifically and accurately answer the jury's question. For example, an appropriate answer to the question would be as follows:

> "In response to your question, 'can we convict on this charge based on the [September 1998] incident?', the answer is no. You may consider evidence of that incident only with regard to the issues of the defendant's intent, knowledge, and lack of accident."

Furthermore, this court has stated when a jury presents a question to the court during deliberations, both parties should provide a written draft of the specific response they want the trial court to give to the jury, just as the parties provide written proposed instruction during the jury instruction conference. *Van Winkle v. Owens-Corning Fiberglas Corp.*, 291 Ill. App. 3d 165, 173, 683 N.E.2d 985, 991 (1997). Both defendant and the State should have prepared a specific written response they wanted the court to give the jury. See *Kinney*, 294 Ill. App. 3d at 909, 691 N.E.2d at 871 (Knecht, J., specially concurring). Such a response would have assisted us in determining whether an appropriate and helpful reply could have been given. *Kinney*, 294 Ill. App. 3d at 909, 691 N.E.2d at 871 (Knecht, J., specially concurring).

We need not specifically address whether the trial court abused its discretion because the totality of events at trial undermines our confidence in the verdict.

## III. CONCLUSION

The excessive other-conduct evidence, the defective jury instruction, and the response to the jury's question undermine our confidence in the jury's verdict. Accordingly, we reverse defendant's conviction. We note, however, the evidence suffices to permit retrial

without offending double jeopardy. We therefore remand to the trial court for a new trial consistent with this opinion.

Reversed and remanded.

STEIGMANN, P.J., and MYERSCOUGH, J., concur.