NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 200220-U

NO. 4-20-0220

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 28, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Adams County |
| JASON L. HILLS, | ) | No. 18CF450 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John C. Wooleyhan, |
| | ) | Judge Presiding. |

---

JUSTICE HARRIS delivered the judgment of the court.
Justices Turner and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The evidence was sufficient to prove defendant guilty beyond a reasonable doubt. The trial court did not commit reversible error by giving the jury Illinois Pattern Jury Instruction, Criminal, No. 3.14 (approved Oct. 17, 2014).

¶ 2    In February 2020, following a jury trial, defendant, Jason L. Hills, was found guilty of two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(2) (West 2016)). On appeal, defendant argues his convictions should be reversed because the State failed to prove him guilty beyond a reasonable doubt and the trial court committed reversible error by giving the jury Illinois Pattern Jury Instruction, Criminal, No. 3.14 (approved Oct. 17, 2014).

¶ 3                           I. BACKGROUND

¶ 4    On June 13, 2018, the State charged defendant with two counts of criminal sexual

assault (720 ILCS 5/11-1.20(a)(2) (West 2016)). In count I, the State alleged defendant penetrated J.A.W.'s vagina with his penis "knowing that J.A.W. was unable to give knowing consent." In count II, the State alleged defendant penetrated J.A.W.'s anus with his penis "knowing that J.A.W. was unable to give knowing consent."

¶ 5        Defendant's case proceeded to a jury trial in February 2020. In the State's case-in-chief, J.A.W. testified as follows. In January 2017, J.A.W. lived in a two-story duplex with her two minor children. Although J.A.W.'s "on-again-off-again boyfriend," Tim Gustison, usually lived in the home, J.A.W. and Gustison had recently stopped dating, and he was in the process of moving out.

¶ 6        J.A.W. knew defendant "from high school," and the two socialized often until Gustison and defendant "had a falling out," after which J.A.W. had little contact with defendant until January 22, 2017. On that date, J.A.W. "liked something that [defendant] posted" on Facebook after which the two struck up a conversation on the website. During the conversation, defendant told J.A.W. that he had just broken up with his girlfriend, "was kind of homeless," and needed a place to shower. J.A.W. offered to let defendant shower at her house that evening once her children were asleep. J.A.W. also asked defendant to bring her some medication to help with her "bad sciatic nerve problem," and defendant offered to bring "some ibuprofen, the 800 kind, and a Tramadol." While the two were communicating, defendant implied he wanted to have sex with J.A.W. by stating he "want[ed] to get under one to get over one," but J.A.W. "ma[d]e it clear to him that [she] w[as] not having any kind of sexual activity."

¶ 7        At approximately 9:30 p.m. on January 22, J.A.W. sent defendant a text message saying he could come over. However, J.A.W. told defendant to park "down the street" because she

did not want Gustison to "assume anything." When defendant arrived at around 11 p.m., he had two pills, one "big, rounder pill" and "a small pill," the latter of which defendant told J.A.W. was Tramadol. J.A.W. was familiar with Tramadol because she had previously been prescribed the medication for her back pain. J.A.W. took both pills within a few minutes of defendant's arrival. Defendant also brought a "handle" of whiskey and a bottle of soda, neither of which J.A.W. asked defendant to bring. For the next several hours, J.A.W. and defendant sat on her couch "[l]istening to music [and] talking." Although J.A.W. was "normally not much of a drinker anymore," she took three "little sip[s]" of the whiskey defendant had brought. While the two were sitting on the couch, there was no "physical contact" between them, nor did the two "talk about having any kind of sexual contact." Eventually, J.A.W. started to feel "overwhelmingly tired" and "w[as] having trouble keeping [her] eyes open." After feeling tired for some period of time, J.A.W. looked at her phone, saw that it was 2:11 a.m., and thought to herself "he's got to go." After that, J.A.W. remembered "a lot of nothing" until her son woke her up later that morning.

¶ 8        After J.A.W.'s son woke her up, she realized she was lying on her back, naked, and covered by a robe. J.A.W. never slept naked. She further realized she was in the same place on her couch where she had been when she checked her phone at 2:11 a.m. but "in more of a reclining position." J.A.W. felt a little sore and noticed "the tip of [her] face kept hurting." J.A.W. also had "no strength" in her hands. After a time, J.A.W. noticed Gustison was calling her on her cell phone. When she answered, Gustison informed her he was on his way to her house to pick up the rest of his items he had stored there. After talking with Gustison, J.A.W. tried to stand up and felt "jello-legged." When she finally managed to stand, she found "everything was just dizzy," "it was hard to walk," and she "didn't know where [she] was" or "what was going on." She proceeded to

her front door to see if it was locked and noticed it was ajar. J.A.W. then began investigating the rest of the house. She noticed the bathroom was "messed up": the floor was "flooded" and the shower curtain was "hanging off the thing[,] like just draped down." J.A.W. also noticed a tampon was "at the bottom of the shower." Although J.A.W. was experiencing her period at the time, she was not wearing a tampon when she woke up. Additionally, towels and clothes, including clothes that did not belong to J.A.W., were "everywhere." J.A.W. then went to her bedroom where she found a "soaking wet towel" and a bottle of lotion in the middle of the room. Although the bed was made and in the same condition J.A.W. remembered it being when she had last seen it, when J.A.W. pulled back the bedding, she found below the comforter several pieces from a jigsaw puzzle she and Gustison had recently glued together. When Gustison arrived at J.A.W.'s home, she told him she "th[ought] [she] may have got [*sic*] raped" and Gustison encouraged her to go to the hospital.

¶ 9        At the hospital, J.A.W. participated in a sexual assault evidence collection examination. During the examination, J.A.W. noticed for the first time that her legs and arms were "bruised pretty badly." J.A.W. did not have these bruises before defendant came over to her house and did not know how she got them.

¶ 10        After J.A.W.'s examination at the hospital was completed, she returned home and observed the police collect evidence from the house. At this time, J.A.W. noticed a stain on the "throw" she kept over her couch which had not been present the night before. The stain was located "at the opposite end" of where J.A.W.'s head had been when she woke up that morning.

¶ 11        J.A.W. text messaged defendant multiple times on January 23. J.A.W. first messaged defendant she "need[ed] [him] to fill in some missing blanks for [her]." Defendant did

not reply to this message. A few hours later, J.A.W. texted defendant asking, in all capital letters, "what the f*** happened?" After another hour, defendant responded "what's up." J.A.W. replied, again in all capital letters, "[w]hat happened last night?" Defendant replied, "Oh, we drank, and talked, and lauhghed [*sic*] and cried." J.A.W. did not respond to defendant's message. However, at 11:45 p.m. the next day, defendant sent J.A.W. an image via text message which stated, "Can I sneak into your bed" and a follow-up message that said "Sorry, I had to."

¶ 12       After January 23, J.A.W. began to "recover[ ]" some memories of what happened that night. She recalled "[t]he feeling of carpet under [her] feet" and "being dragged from [her] bathroom to [her] couch that night by [defendant]."

¶ 13       The State also called Jessica Bichsel, the registered nurse who performed J.A.W.'s sexual assault evidence collection examination. According to Bichsel, during the examination J.A.W. reported that during the previous evening she had consumed "one 800 milligram ibuprofen [and] one Tramadol tablet that was given to her from her friend" as well as "three shots of [whiskey]." Bichsel testified she was familiar with Tramadol and described it as a pain medication that should not be taken with alcohol because alcohol "heightens the effect" of the medication. Bichsel then collected physical evidence from J.A.W., including a vaginal and anal swab. According to Bichsel, "[n]o injury [was] noted" to J.A.W.'s "vaginal area" or "rectal area" during the examination, but J.A.W. did have "multiple bruises and some scratches."

¶ 14       The State next called Jessica Hollensteiner, a patrol officer with the Quincy Police Department. According to Hollensteiner, she went J.A.W.'s home to collect evidence after J.A.W. completed the sexual assault evidence collection examination. Among other items of evidence, Hollensteiner took the blanket that covered J.A.W.'s couch on which J.A.W. had slept on January

23. According to Hollensteiner, the blanket had "multiple brown stains that were possibly believed to be from [J.A.W.] being on her period."

¶ 15        Next, the State called Anjanette Biswell, a sergeant with the Quincy Police Department. Biswell testified that, during an interview with J.A.W., J.A.W. told her that several days after January 23, 2017, she recalled another memory from that night. J.A.W. told Biswell she remembered defendant "with his arm under her scooting her up on the couch and covering her with a robe."

¶ 16        The State also called Kelsey Fontanetta, a forensic scientist employed by the Illinois State Police. Fontanetta testified she tested the vaginal swab and the anal swab collected from F.A.W. during the sexual assault evidence collection examination for the presence of semen using both a "presumptive test" and a "confirmatory test." According to Fontanetta, both swabs tested positive for the presence of semen in the presumptive test but tested negative during the confirmatory test. After another forensic scientist completed a "profil[e]" of the DNA discovered on J.A.W.'s vaginal and anal swabs, Fontanetta compared the profiles against a DNA profile created from a buccal swab obtained from defendant. According to Fontanetta, defendant was "included as a possible contributor" of the DNA found on the vaginal and anal swabs and the likelihood that someone other than defendant was a "contributor" to the DNA identified on the anal swab was "one in 470 sextillion."

¶ 17        Testifying in his own defense, defendant stated in relevant part as follows. On January 22, 2017, J.A.W. invited defendant to take a shower at her house after her children went to bed. J.A.W. asked defendant to bring "some pills" to help with her lower back pain. When defendant told J.A.W. that he had just purchased a bottle of whiskey, she asked him to bring that

as well. Defendant brought the bottle of whiskey to J.A.W.'s house as well as two identical "ibuprofen 800[ ]" pills. Defendant did not tell J.A.W. he had brought her a Tramadol pill. J.A.W. took the pills, and the two then sat in her living room for "four or five hours" talking and listening to music. Over the course of the evening, J.A.W. and defendant both had two or three "shots" of the whiskey. At no point during the course of the evening did the two discuss having sex, and at no point did J.A.W. seem intoxicated to defendant.

¶ 18          Between 2:30 and 3 a.m., J.A.W. took defendant to the bathroom, got him a towel, and started showing him how to use the shower. Defendant then urinated, and when he turned around from the toilet, he noticed J.A.W. "standing there with her back to [him] with nothing on except for her bra and underwear." Defendant asked J.A.W. if she needed help taking her bra off, and J.A.W. said yes. Defendant helped remove J.A.W.'s bra, and J.A.W. removed her underwear, got in the shower, and grabbed defendant by the shirt, trying to pull him into the shower too. Defendant was still fully clothed and told J.A.W. to wait while he undressed. Defendant then got in the shower, and the two had vaginal intercourse for approximately half an hour. While the two had intercourse, J.A.W. was holding onto the shower curtain and eventually pulled it down, causing water to "go everywhere." The two stopped having sex while defendant attempted to reattach the shower curtain, but he was unsuccessful. The two then exited the bathroom and J.A.W. got defendant a glass of water while he went to her bedroom. J.A.W. brought defendant the water and then "pushed [him] back onto the bed and climbed on top of [him]." The two then had vaginal intercourse for several more hours. At no point did defendant penetrate J.A.W.'s anus because he found anal sex "disgusting." After J.A.W. and defendant finished having sex, she "walked back to where she was sitting originally ***, on the couch" and "draped" defendant's jacket over herself.

After defendant got dressed, he noticed it was "starting to get daylight," so he approached J.A.W. and told her she needed to get up to get her children ready for school. Although J.A.W. told defendant she was awake and the two had a short conversation, she did not move. Defendant took his jacket from her and laid her bathrobe over her. When defendant heard one of J.A.W.'s children stirring, he left.

¶ 19        Defendant was not concerned when J.A.W. text messaged him later asking him to give her more details about what had happened the night before because he "assumed that was [Gustison] messaging [him] from her phone." Defendant did not remind J.A.W. they had sex because he "figured she knew that," and he "was still under the impression that it might have been not her" that was texting him. Defendant did not send J.A.W. a message asking to sneak into her bed or the follow-up message saying, "sorry I had to." Rather, those messages were sent by J.A.W.'s "best friend" who "had stolen [defendant's] phone that night."

¶ 20        After the defense rested, the State recalled J.A.W. and inquired whether she "[went] into the bathroom and turn[ed] the shower on for [defendant]," "[went] into the bathroom when he was there and [took her] clothes off," or "g[o]t in the shower, naked in the shower, and tr[ied] to pull him in with [her]." J.A.W. testified she "[did] not recall" any of that happening. The State next asked whether J.A.W. "ha[d] any recollection of [defendant] having sex with [her] in the shower" or "ha[d] any recollection of [defendant] having sex with [her] in the bedroom." J.A.W. testified she did not recall having sex with defendant. The trial court then inquired of J.A.W. as follows:

"Q. When [the assistant state's attorney] was asking you some questions a

minute ago about things that happened about having sex with [defendant] or turning

- 8 -

on the shower, those questions, you said you did not recall those things, is that right?

A. Yes, sir.

Q. Does that mean that those things did not happen or you don't remember?

A. I don't know if they did or not. I don't remember doing that. I don't remember having any of those actions take place.

Q. So, when you say you don't recall, you're saying you don't remember any of those things?

A. I cannot, for the life of me, pull up the memory of that happening, sir."

¶ 21　　　After the presentation of evidence, the trial court conducted a jury instruction conference. During the conference, the State requested the court give the following jury instruction, which the assistant state's attorney stated was prepared in conformity with Illinois Pattern Jury Instruction, Criminal, No. 3.14 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.14).

"Evidence has been received that the defendant has been involved in an offense other than that charged in the indictment.

This evidence has been received on the issue of whether J.A.W. was unable to consent to the acts of sexual penetration and may be considered by you only for that limited purpose.

It is for you to determine whether the defendant was involved in that offense, and, if so, what weight should be given to this evidence on the issue of whether J.A.W. was unable to consent to the acts of sexual penetration."

Defense counsel objected to the giving of this instruction, arguing it was inapplicable because the only evidence of another offense was "the alleged victim's own statement" and the evidence was not of "some other crime" but was J.A.W.'s "version of events pertaining to this particular alleged offense." Defense counsel continued that he expected the instruction would "be a highlighting instruction" that "would lend credibility to the alleged victim's statement." He also argued the instruction was improper because the committee comments to the instruction "indicate that it should be given *** at the time of the testimony as well as at the close of the case" and noted the instruction had not been given when the evidence was first presented. The State responded that it was submitting the instruction because "there ha[d] been evidence that *** [d]efendant delivered a controlled substance to the victim in this case." The court ultimately gave the instruction over defendant's objection.

¶ 22          The jury found defendant guilty of counts I and II.

¶ 23          In March 2020, defendant filed two posttrial motions for judgment notwithstanding the verdict or, in the alternative, a new trial. In the first motion, defendant alleged IPI Criminal No. 3.14 had been improperly given because it "operated as a highlighting instruction when the evidence of an 'offense' was in fact tenuous" and because the jury "was not given the instruction just before or immediately after the jury heard the evidence in question." In his second motion, defendant alleged the State failed to prove him guilty beyond a reasonable doubt. The trial court denied both of defendant's motions and sentenced him to consecutive prison terms of five years on count I and five years on count II.

¶ 24          This appeal followed.

¶ 25                              II. ANALYSIS

- 10 -

¶ 26 On appeal, defendant argues the State failed to prove him guilty beyond a reasonable doubt. Specifically, defendant argues the State's evidence was insufficient to establish "beyond a reasonable doubt that J.A.W. was unable to give knowing consent" and was insufficient to establish he committed an act of sexual penetration by placing his penis into J.A.W.'s anus, as alleged in count II. Separately, defendant argues the trial court committed reversible error by giving the jury IPI Criminal No. 3.14.

¶ 27 A. The Evidence Was Sufficient to Prove Defendant Guilty Beyond a Reasonable Doubt

¶ 28 Defendant first argues the State failed to prove him guilty beyond a reasonable doubt.

¶ 29 "The State has the burden of proving beyond a reasonable doubt each element of an offense." (Internal quotation marks omitted.) *People v. Henderson*, 2019 IL App (4th) 170305, ¶ 15, 124 N.E.3d 1080. "Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime." (Internal quotation marks omitted.) *People v. Anderson*, 2018 IL App (4th) 160037, ¶ 70, 102 N.E.3d 260. In reviewing a defendant's challenge to the sufficiency of the State's evidence, it is not our role to retry the defendant. *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876. "Rather, it is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Id.* "Accordingly, a reviewing court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." (Internal quotation marks omitted.) *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 55, 126 N.E.3d 703. "A criminal conviction will

not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Gray*, 2017 IL 120958, ¶ 35.

¶ 30　　　　To prove defendant guilty of criminal sexual assault, the State was required to prove beyond a reasonable doubt that defendant (1) committed an act of sexual penetration and (2) knew that J.A.W. was unable to give knowing consent to an act of sexual penetration. See 720 ILCS 5/11-1.20(a)(2) (West 2016).

¶ 31　　1. *The Evidence Was Sufficient to Prove J.A.W. Was Unable to Give Knowing Consent*

¶ 32　　　　Defendant claims the State's evidence was insufficient to establish that J.A.W. was unable to give knowing consent. As used in section 5/11-1.20(a)(2) of the Criminal Code of 2012, the term "consent" means "a freely given agreement to the act of sexual penetration *** in question." 720 ILCS 5/11-0.1 (West 2016); *id.* § 11-1.70(a). A person may be found unable to give knowing consent where, for example, she was asleep or rendered unconscious after ingesting alcohol. *People v. Vaughn*, 2011 IL App (1st) 092834, ¶ 39, 961 N.E.2d 887; *People v. Fisher*, 281 Ill. App. 3d 395, 403, 667 N.E.2d 142, 147 (1996).

¶ 33　　　　In support of his claim, defendant first argues the State was "required to present expert evidence as to the physiological effect of the pills on J.A.W." because "[t]he concept of a drug that apparently does not affect the user for almost five hours and then suddenly practically knocks her out with no warning is far beyond the knowledge of the average juror." As authority for this argument, defendant cites *Carter v. Dunlop*, 138 Ill. App. 3d 58, 484 N.E.2d 1273 (1985), as well as six cases from outside of Illinois. Defendant does not explain how *Carter*, a civil medical malpractice case, or any of the foreign jurisdiction cases he cites (several of which are also civil

cases and three of which are not even published decisions), are relevant to his argument, nor have we discovered anything in the cases pertinent to defendant's contention. Regardless, we find defendant's argument meritless. Section 5/11-1.20(a)(2) of the Criminal Code of 2012 does not require the State to prove the mechanism or series of events that rendered a victim unable to consent. Rather, the statute only requires the State to prove beyond a reasonable doubt the victim was, *in fact*, unable to consent.

¶ 34        Here, viewed in the light most favorable to the prosecution, the State's evidence was sufficient to establish beyond a reasonable doubt that J.A.W. was unable to consent to an act of sexual penetration. The State's evidence showed that, after consuming two pain pills and possibly three shots of whiskey, J.A.W. began to feel "overwhelmingly tired," and subsequently, she was unable to remember almost anything until the next morning. J.A.W. did recall being "dragged from [her] bathroom to [her] couch" by defendant and remembered defendant "with his arm under her scooting her up on the couch and covering her with a robe." During the sexual assault evidence collection examination, J.A.W. realized that she had been "bruised pretty badly," and Nurse Bichsel noticed J.A.W. had "some scratches." Photographs taken during the examination depicted numerous bruises on J.A.W.'s feet, knees, upper shin, calf, and wrists. J.A.W. testified she had no bruises before defendant came to her house on January 22. We find this evidence and the reasonable inferences that flow from it support the State's argument that defendant had to "manhandle J.A.W. during the sexual activity because she was unconscious." It is uncontradicted that J.A.W. consumed pain medication and alcohol earlier in the evening. Her subsequent testimony that she remembered defendant dragging her out of the bathroom, where according to defendant, the first act of sexual intercourse took place, arguably established *both* that

J.A.W. was unable to give her consent to the sex act *and* defendant was aware of her inability to give her consent. Aside from the evidence of J.A.W.'s intoxication, no other evidence existed to explain why J.A.W. would have been unable to walk but, instead, had to be dragged by defendant. J.A.W.'s bruises corroborated her testimony she was dragged by defendant out of the bathroom. It follows that an individual who, as a result of their intoxication, is unable to walk, is also unable to consent to sexual intercourse. This would be obvious to the person dragging the intoxicated individual. Accordingly, we find a rational trier of fact could have determined beyond a reasonable doubt defendant knew J.A.W. was unable to give knowing consent to an act of sexual penetration.

¶ 35                    2. *The Evidence Was Sufficient to Establish Anal Penetration*

¶ 36          Defendant also argues the State's evidence was insufficient to establish he committed an act of sexual penetration by placing his penis into J.A.W.'s anus, as alleged in count II. As used in section 5/11-1.20 of the Criminal Code of 2012, the term "sexual penetration" means "any contact, however slight, between the sex organ or anus of one person and *** the sex organ, mouth, or anus of another person." 720 ILCS 5/11-0.1 (West 2016). "Whether sexual penetration occurred is a question of fact to be determined by the jury." *People v. Janusz*, 2020 IL App (2d) 190017, ¶ 71. "The trier of fact is entitled to draw all reasonable inferences from both circumstantial and direct evidence, including an inference of penetration. Such an inference of penetration is unreasonable only if the victim denies that penetration occurred." *People v. Branch*, 2017 IL App (5th) 130220, ¶ 12.

¶ 37          In the present case, the State's evidence showed the anal swab taken from J.A.W. during the sexual assault evidence collection examination tested positive for semen during the presumptive test, which the State's expert testified "indicat[ed] the presence of semen." Although

- 14 -

later testing did not confirm the presence of semen, the State's expert determined the anal swab contained defendant's DNA. A reasonable inference from this evidence is that there was contact between J.A.W.'s anus and defendant's penis, as alleged by the State.

¶ 38 Defendant argues that the evidence of anal penetration was insufficient because "J.A.W. did not testify as to whether she had any discomfort or soreness in the *** anal areas after the incident" and Nurse Bichsel "noted no injury to J.A.W.'s *** anal areas." Yet, physical injury is not an element of criminal sexual assault. See 720 ILCS 5/11-1.20(a)(2) (West 2016); see also *People v. Raymond*, 404 Ill. App. 3d 1028, 1040, 938 N.E.2d 131, 143 (2010) ("[T]he lack of semen or trauma to the victim's genitals is not dispositive of the issue of penetration."). As stated above, to prove penetration, the State was only required to show "any contact, however slight" between defendant's penis and J.A.W.'s anus, not necessarily that an injury occurred to J.A.W.'s anus. See 720 ILCS 5/11-0.1 (West 2016).

¶ 39 Defendant also contends that, because "the record contains no evidence as to precisely where on or in J.A.W.'s body the results of the anal swabbing were taken from," the State failed to establish anal penetration occurred. Contrary to defendant's assertion, we believe the jury could have reasonably inferred that Nurse Bichsel's testimony that she collected an "anal swab" meant that she collected a swab from J.A.W.'s anus. Whether she collected it from inside J.A.W.'s anus or the surface of her anus is not dispositive of the issue. See *id.*

¶ 40 Finally, defendant claims because J.A.W. was sleeping on her back, "[i]t is *** more than possible that fluids containing [defendant's] DNA seeped out of J.A.W. and past her anal area, contaminating it with DNA, before continuing on to the couch." Defendant states this theory is bolstered by the stains found on the blanket on which J.A.W. slept, which he posits,

resulted from J.A.W.'s menstruation. However, "[a] jury is not obligated to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt." (Internal quotation marks omitted.) *People v. Evans*, 209 Ill. 2d 194, 212, 808 N.E.2d 939, 949 (2004). Merely because a hypothetical factual scenario is possible "does not mean that a jury cannot rely on the reasonable inferences that flow from the unrebutted evidence. The State need not disprove or rule out all factual scenarios." *People v. Newton*, 2018 IL 122958, ¶ 27, 120 N.E.3d 948. As noted above, a reasonable inference could be drawn from the State's unrebutted DNA evidence that defendant penetrated J.A.W.'s anus. That inference was sufficient to convict defendant on count II.

¶ 41　　B. Instructing the Jury With IPI Criminal No. 3.14 Was Not Reversible Error

¶ 42　　Defendant's final claim on appeal is that the trial court committed reversible error by giving the jury IPI Criminal No. 3.14. He argues the court erred when it "failed to give a limiting instruction when J.A.W. first testified that [defendant] had allegedly given her the pills." He also argues the instruction was improper because "there was no evidence that [defendant] had committed a prior bad act, *i.e.*, that he had given J.A.W. a controlled substance." The State responds that the court did not err in giving IPI Criminal No. 3.14 and, even if it did, any such error was harmless.

¶ 43　　"There must be some evidence in the record to justify [a jury] instruction, and it is within the trial court's discretion to determine which issues are raised by the evidence and whether an instruction should be given." *People v. Mohr*, 228 Ill. 2d 53, 65, 885 N.E.2d 1019, 1025-26 (2008). "The jury should not be instructed on matters not raised by the evidence." *People v. Cook*, 2011 IL App (4th) 090875, ¶ 27, 957 N.E.2d 563. A reviewing court examines a claim of

instructional error for an abuse of discretion. *Mohr*, 228 Ill. 2d at 66. "A trial court abuses its discretion if the jury instructions given are unclear, mislead the jury, or are not justified by the evidence and the law." *People v. Lovejoy*, 235 Ill. 2d 97, 150, 919 N.E.2d 843, 872-73 (2009).

¶ 44        In the present case, the trial court gave the jury the following instruction at the State's request:

> "Evidence has been received that the [d]efendant has been involved in an offense other than that charged in the [i]ndictment. This evidence has been received on the issue of whether J.A.W. was unable to consent to the acts of sexual penetration and may be considered by you only for that limited purpose. It is for you to determine whether the [d]efendant was involved in that offense, and, if so, what weight should be given to this evidence on the issue of whether J.A.W. was unable to consent to the acts of sexual penetration."

During the jury instruction conference, the State argued this instruction was necessary because "there ha[d] been evidence that *** [d]efendant delivered a controlled substance to the victim in this case."

¶ 45        As stated above, defendant argues the trial court's instruction was improper because the court "failed to give a limiting instruction when J.A.W. first testified that [defendant] had allegedly given her the pills." Defendant notes that in *People v. Denny*, 241 Ill. App. 3d 345, 360-61, 608 N.E.2d 1313, 1324 (1993), this court wrote:

> "Because of the significant prejudice to a defendant's case that the admission of other crimes evidence usually risks, we hold that trial courts should not only instruct the jury in accordance with [IPI Criminal No. 3.14] at the close of

the case, but also orally from the bench (unless defendant objects) at the time the evidence is first presented to the jury."

According to defendant, *Denny* requires that "[i]f a trial court gives [IPI Criminal No. 3.14] at the close of the case, it must have given that instruction orally from the bench at the time the evidence was first presented to the jury." We find defendant's assertion regarding this passage from *Denny* is misplaced as it more accurately describes a best practice for trial courts to follow rather than a requirement. See, *e.g.*, *People v. Brown*, 319 Ill. App. 3d 89, 100, 745 N.E.2d 173, 183 (2001) (noting that, in *Denny*, we "*suggested* trial courts not only instruct the jury in accordance with [IPI Criminal No. 3.14] at the close of the case, but also at the time the evidence is first presented to the jury" (emphasis added)). Moreover, since *Denny* was decided, both our supreme court and this court have held the trial court's failure to instruct the jury in accordance with IPI Criminal No. 3.14 when other crimes evidence is first admitted does not require reversal so long as the court gives the instruction at the close of the case. See *People v. Heard*, 187 Ill. 2d 36, 61, 718 N.E.2d 58, 72 (1999); see also *People v. Abernathy*, 402 Ill. App. 3d 736, 755, 931 N.E.2d 345, 360-61 (2010). Thus, we find defendant's first claim of error regarding the use of IPI Criminal No. 3.14 is without merit.

¶ 46          Defendant also argues the trial court erred in giving IPI Criminal No. 3.14 in the absence of any evidence he "committed a prior bad act, *i.e.*, that he had given J.A.W. a controlled substance." As an initial matter, we agree that, at trial, the State failed to present evidence that any substance defendant delivered to J.A.W. was, in fact, a controlled substance. J.A.W.'s testimony that one of the pills provided to her by defendant was a Tramadol did not, by itself, establish that the pill was a controlled substance. However, even assuming, *arguendo*, that giving IPI Criminal

- 18 -

No. 3.14 was improper, we find any error that resulted from the giving of the instruction was harmless. "An error in a jury instruction is harmless if it is demonstrated that the result of the trial would not have been different had the jury been properly instructed." (Internal quotation marks omitted.) *Mohr*, 228 Ill. 2d at 69. Here, we find the result of defendant's trial would have been the same even if the court had not given the jury IPI Criminal No. 3.14. As pointed out by the State, defendant did not object to J.A.W.'s testimony regarding the Tramadol and, in the absence of a limiting instruction, the jury could have considered the evidence for any permissible purpose in its deliberations. In this case, the court's provision of the instruction may well have *benefitted* defendant because it served to limit the extent the jury could consider the evidence of defendant's provision of the pills to J.A.W. beyond that which the jury might otherwise have considered it.

¶ 47    Moreover, we find the trial court's decision to give IPI Criminal No. 3.14 was harmless because the evidence of defendant's guilt was clear and convincing. See *People v. Dennis*, 181 Ill. 2d 87, 95, 692 N.E.2d 325, 330 (1998). Defendant admitted to having had vaginal intercourse with J.A.W. on the night in question. In addition, his DNA was found on the anal swab collected from J.A.W. during the sexual assault evidence collection examination. The evidence also showed that J.A.W. had consumed pain pills and possibly three shots of whiskey and subsequently lost consciousness. She later recalled being dragged by defendant from her bathroom to the couch in the living room. The jury was presented with photographs of bruising on J.A.W. which she did not have before defendant came to her house. Ultimately, the evidence established J.A.W.'s state of unconsciousness, which would have been obvious to defendant. Thus, we find no reversible error in the trial court's giving of IPI Criminal No. 3.14.

¶ 48    III. CONCLUSION

- 19 -

¶ 49        For the reasons stated, we affirm the trial court's judgment.

¶ 50        Affirmed.