NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210272-U

NO. 4-21-0272

FILED
September 22, 2022
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Adams County |
| NATHAN J. NELSON, | ) | No. 20CF302 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Amy C. Lannerd, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Harris and Zenoff concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The circuit court did not abuse its discretion in admitting other-conduct evidence
                    and by excluding defendant's Life360 map, and the State's evidence was
                    sufficient to prove beyond a reasonable doubt defendant was the person who
                    committed the alleged offenses.

¶ 2             In May 2020, the State charged defendant, Nathan J. Nelson, by information with

three counts of sexual exploitation of a child (720 ILCS 5/11-9.1(a)(1) (West 2020)).  In June

2020, a grand jury indicted defendant on the same three charges.  After a March 2021 trial, a jury

found defendant guilty of all three charges.  Defendant filed a posttrial motion and an addendum

to the motion.  At a joint May 2021 hearing, the Adams County circuit court denied defendant's

posttrial motion and sentenced him to 30 months' probation.

¶ 3             Defendant appeals, contending (1) the trial court erred by admitting irrelevant and

prejudicial other-conduct evidence, (2) the court erred by prohibiting defendant from introducing

his Life360 map for the date of the incident, and (3) the State's evidence was insufficient to prove him guilty beyond a reasonable doubt of sexual exploitation of a child. We affirm.

¶ 4                                      I. BACKGROUND

¶ 5        The charges alleged that, on May 19, 2020, defendant intentionally engaged in a sexual act, masturbation, while in the presence of E.M.E., R.P.E., and A.E.T., each being a child under the age of 13 at the time of the act, with knowledge a child would view his act.

¶ 6        In September 2020, the State filed three motions *in limine*. The first motion *in limine* was a standard motion that sought to prohibit defendant from presenting evidence regarding plea negotiations and other matters. The second motion *in limine* sought to allow evidence at trial under section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2020)) of out-of-court statements by the three victims to their parents; Officer J.D. Summers; and Susan Tode, a forensic interviewer at the Child Advocacy Center. The third motion *in limine* sought to allow evidence of E.M.E.'s and R.P.E.'s statements right after the incident under the excited-utterance exception to the hearsay rule. After an evidentiary hearing, the circuit court granted the first motion by agreement, granted the second motion with a few limitations, and granted the third motion.

¶ 7        The State later filed a fourth motion *in limine*, seeking to prohibit defendant from presenting two purported global positioning system (GPS) maps from his Life360 application on his cellular telephone (cellphone) from Tuesday May 19. The State objected to the admission of the maps based on late discovery and lack of authentication. On October 21, 2020, trial judge Frank McCartney held a hearing on the new motion *in limine*. Only the maps themselves were presented to the court. Judge McCartney noted it was not clear at that point how the foundation could be laid to get the maps admitted. If the case went to trial that day, Judge McCartney would

preclude the evidence but noted he would be agreeable to a continuance. Defendant moved to continue his trial, and Judge McCartney granted the continuance.

¶ 8 The State amended its fourth motion *in limine* and attached a supporting memorandum, asserting defendant cannot authenticate the maps through the proffered testimony of Tony Cornett, defendant's girlfriend's father. On December 21, 2021, trial judge Robert Adrian held a hearing on the amended fourth motion *in limine*. After hearing the parties' arguments, the trial judge found defendant would have to testify to lay the foundation for the admission of the maps.

¶ 9 In March 2021, trial judge Amy Lannerd held a jury trial on the three charges against defendant. The State presented the testimony of (1) David E., father of E.M.E. and R.P.E; (2) E.M.E; (3) R.P.E; (4) Sara T., mother of A.E.T.; (5) A.E.T.; (6) Megan Sohn, babysitter for Laina B.; (7) Audrey A., cousin of Laina B.; (8) Lauryn Anders, human resource director for defendant's employer; (9) Betsy Terwelp, manager of perishables at Hy-Vee on Broadway Street; (10) Keith Beckett, asset protection manager for Nieman Foods (County Market); (11) Bob Beswick, Bank of Springfield employee; (12) Stephanie B., mother of Laina B.; (13) Laina B.; (14) Nick Eddy, Quincy police investigator; (15) Tode; and (16) Officer Summers. It also presented numerous exhibits, including (1) an aerial map of the area; (2) David's letter to neighbors about the incident; (3) a photograph of a computer screen showing defendant's picture; (4) a photograph of defendant's mother's car taken by Laina; (5) defendant's work time card for May 19, 2020; and (6) a video of the police interview of defendant. Defendant presented the testimony of the following people: (1) Tony; (2) Emily Cornett, defendant's girlfriend and Tony's daughter; and (3) Shaun Nelson, defendant's mother. Defendant also presented Tony's Sprint telephone bill for the period of April 23, 2020, to May

22, 2020. In rebuttal, the State recalled Officer Summers, and defendant recalled Emily in surrebuttal. The evidence relevant to the issues on appeal follows.

¶ 10        E.M.E. testified that, in May 2020, she was nine years old and in fourth grade. Occasionally, she would walk her dog around the block with her younger sister, R.P.E., and her friend, A.E.T., who also had a dog. In May 2020, the three of them went on a walk around their block. While walking, a guy in a white car pulled up to them and asked if they had seen his dog. The man showed A.E.T. a photograph of his dog on a cellphone, and A.E.T. said the dog looked like a beagle. The girls continued their walk, and the car came around again. The man asked the three girls if they wanted to see another picture of his dog. All three girls walked up to the passenger's side of the car, and the window was down. The man showed them another picture of his dog, and E.M.E. observed him playing with his penis. E.M.E. thought the man was wearing jeans and a red sweatshirt with a hood. His jeans were at his feet. E.M.E. said the man was a teenager and he was the only person in the white car. She described his hair as yellowish and noted it went straight up and was curly. E.M.E. had seen the man before in the neighborhood walking a dog with a girl. They finished walking around the block and dropped A.E.T. off at her house. When E.M.E. and R.P.E. got home, they told their dad what happened. Their father drove E.M.E. around looking for the white car, but she did not see it. Officer Summers came over to her home and asked her questions about the incident. Additionally, E.M.E. pointed out on a large aerial map the route of the walk she took with R.P.E. and A.E.T.

¶ 11        R.P.E. testified she was seven years old in May 2020. R.P.E. also observed the man's "private parts" and him "wiggling them around." She described the man as having blondish hair and wearing a red hoodie sweatshirt.

¶ 12        David, the father of E.M.E. and R.P.E., testified he could not remember exactly

what time the girls returned home from their walk but thought it was "somewhere around 11:00." The girls had reported they saw a man's penis and the man was touching his penis. The girls described the man as a teenage boy with white skin, blond hair, and freckles. They noted the man's "hair looked a little bit longer" and was curly at the ends but kind of thin on top of his head. The girls stated the car he was driving was white and looked like their neighbor's white sedan-style car. The car had a yellow sticker on the back of it. David stated he went out looking for the car and called the police while driving. He could not locate the car. Officer Summers arrived about 30 minutes after David called the police. David talked with Officer Summers, and Officer Summers talked with both girls. After Officer Summers left, David made a flyer alerting neighbors about the incident and seeking any possible surveillance video. In the flyer, David described the driver as a teenager with curly shorter hair wearing a red sweatshirt. He also requested his neighbors to review footage on any security camera they had from 10:30 to 11:30 a.m. David further testified his girls were never shown a photographic lineup and asked to identify the driver of the white car.

¶ 13        A.E.T. testified she was in third grade in May 2020. She described the driver of the white car as having blond hair that was bald in the middle and then hair on the sides. At some point, her mother had called her over and said, "look at this." Her mother showed her a picture on the computer and asked, "Is this the person?" A.E.T responded in the affirmative. When shown State's exhibit No. 4B, A.E.T. identified that as the picture she saw on the computer screen. State's exhibit 4B was a picture of a computer screen and on the computer screen was a photograph of defendant with the words "Quincy Arrest" over his photograph with his name below the photograph. At the very top in smaller letters in the uniform resource locator bar, it stated "ts/quincy-police-arrest-man-following-reports-he-was-exposing-h." A.E.T. did not

remember if there were any words on the computer screen when she observed the photograph. A.E.T. testified the photograph was of the person who was driving the white car.

¶ 14     During her testimony, Sara, A.E.T.'s mother, identified her home on the aerial map and explained a walking path exists from Evangeline Street north that connects to a different neighborhood. She testified that, after talking to E.M.E. and R.P.E.'s mother, she asked A.E.T. if she had seen the man before. A.E.T. told her she had seen the man in the neighborhood walking two dogs and usually a girl around his age was walking with him. A.E.T. did not know the man's name. She described the man as having longer blondish hair and always wearing a hat. Sara further testified that, after defendant's arrest, she observed on KHQA's Facebook page a photograph of defendant. When Sara first observed the Facebook post, she was alone in the room. As she was looking at the post, A.E.T. came into the room, pointed at the computer screen, and said, "That's him." Sara did not recall how much of the wording was on the computer screen when A.E.T. observed it. Sara further testified she did not make corrections to David's notice to their neighbors.

¶ 15     Tode testified she conducted forensic interviews of each girl on May 27, 2020. The videos of each interview were played for the jury. During the interview of A.E.T., A.E.T. stated she had not seen the car that the man was driving before but had previously seen the man and the dog in the man's photograph. A.E.T. described the man as having blond hair that was curly on the ends. On more than one occasion she referred to the man as looking weird. A.E.T. further described the man as being kind of bald on the top of his head. She explained it was short on top and curly on the sides. A.E.T. described his girlfriend as having brown curly hair. A.E.T. had not seen the man since the incident.

¶ 16     During the interview of E.M.E., E.M.E. stated the driver had curly hair that was

not that long and freckles or brown spots. When asked how long his hair was, E.M.E. said it was curly and went up and not down. E.M.E. further noted he was wearing a red sweatshirt with a hood, and when he drove away the first time, he had the hood up over his head. She too stated she had seen him before with a girl walking a dog.

¶ 17    In her interview, R.P.E. stated she had never seen the man before. She described the man as having freckles, reddish-colored hair, and wearing a red sweatshirt with the hood up.

¶ 18    Officer Summers testified he arrived at E.M.E. and R.P.E.'s house at 11:55 a.m. on May 19, 2020. He talked to the girls together. They told him a white Chevrolet Malibu pulled up next to them and asked if they wanted to see a picture of a dog. The driver was a white male with blond curly or wavy hair. They believed the dog in the photograph he showed them was a beagle. The car drove off but came back again. The driver asked the girls if they wanted to see another picture of the dog. When they went over to the car, the driver was exposing himself. Officer Summers also spoke with A.E.T., who was eight years old at the time. She gave the same description of the driver and dog in the photograph. She believed the driver was college-age but still a teenager.

¶ 19    After Officer Summers returned home from work on May 19, his wife received a text from Stephanie B. with a photograph of a white Chevrolet Impala. Stephanie was concerned because the vehicle had driven by Laina, her 11-year-old daughter, on numerous occasions. Laina had taken a picture of the car. Stephanie wanted Officer Summers to check into the vehicle and make sure nothing was going on. On May 20, 2020, Officer Summers asked Stephanie to send him the photograph of the car and a screenshot from Laina's cellphone showing the date and time the picture was taken. Stephanie did so, and the picture was taken May 19, 2020, at 11:28 a.m. Officer Summers also received screenshots of Life360 maps from

the day before from Laina's cellphone. Laina's photograph of the white car contained the car's license plate, and Officer Summers learned the car was registered to Shaun Nelson and was a 2008 Chevrolet Impala. Officer Summers testified a Chevrolet Impala was similar in body style to a Chevrolet Malibu. The Impala was a full-size sedan, and a Malibu was a smaller version.

¶ 20 Officer Summers further testified that, through social media, he learned Shaun had an 18-year-old son and possible dogs were associated with the son. With Laina's Life360 map and the photograph, he determined Laina took the photograph around 1400 South 46th Street. He observed the Chevrolet Impala parked at Shaun's address. Officer Summers noted the car was a four-door vehicle with tinted windows. Officer Summers made contact with defendant, who was 18 years old, at his home, and defendant's father drove defendant to the police station. There, Officer Summers and another officer interviewed defendant. At the end of the video, Officer Summers took two photographs of defendant. A video of the interview was played for the jury.

¶ 21 In the video, defendant is wearing a grey hoodie sweatshirt and baseball cap backwards. During the May 20, 2020, interview, defendant testified he worked for Rinella as a merchandiser. The day before he worked 6 a.m. to 12 p.m. As a merchandiser, he went to multiple stores and stocked store shelves. On May 19, defendant was at Wal-Mart from 6 to 9 a.m., County Market from 9 to 10:45 a.m., and Hy-Vee on Broadway Street from 10:45 a.m. to 12 p.m. After work, defendant went to his girlfriend's house, picked her up, and then went to his home. He denied driving through neighborhoods and stated he took Broadway Street. He had driven his mother's white Chevrolet Impala, and he was the only one that had driven the white Impala on May 19. Defendant admitted his vehicle was in the photograph taken around 11:30 a.m. on May 19. Moreover, defendant noted he had the Life360 application on his cellphone,

which could show his whereabouts the day before. However, defendant refused to give his cellphone to Officer Summers and noted he did not have it with him. Defendant also stated he had two dogs at his house, and his girlfriend had three dogs at her house, including a beagle. Defendant explained the route where he and his girlfriend walked the dogs in the area.

¶ 22 Additionally, Officer Summers testified that, after the interview of defendant, he investigated defendant's statements. He went to County Market and obtained surveillance video. The surveillance video was played for the jury and showed defendant left County Market at 10:41 a.m. on May 19. In the video, defendant was wearing a black hoodie sweatshirt and a black baseball cap backwards. Officer Summers also obtained surveillance video from the Bank of Springfield branch located next to County Market. That video, which was also played for the jury, showed defendant turned southbound onto 48th Street, which was away from Hy-Vee on Broadway Street. Officer Summers also contacted defendant's employer. Defendant's timecard for May 19 showed defendant started work at 6 a.m. and left work at 10:40 a.m. from County Market. Officer Summers further testified defendant's home was around 1.3 miles from the incident, and defendant's girlfriend's home was 1.1 miles from the incident if using the walkway between Evangeline and the other subdivision. Additionally, Officer Summers testified he never obtained defendant's cellphone and defendant never sent him his Life360 information.

¶ 23 Terwelp, the manager of perishables at Hy-Vee on Broadway, testified she was familiar with defendant and reviewed the surveillance videos for May 19. She determined defendant did not enter Hy-Vee on Broadway Street on May 19.

¶ 24 Laina testified she turned 11 on May 16, 2020, and her cousin Audrey came to her home that day. One thing they did together was make videos in the front yard. While they were making videos, Laina observed a small white car driving back and forth in front of her home. It

happened enough times that she became a little concerned. Laina testified it was hard to see the driver because the windows were tinted. It looked like the driver was wearing a hoodie and had blondish-brown hair. Audrey mentioned the car to Laina, which made Laina more aware of the car, and they decided to go inside.

¶ 25    Laina also testified about May 19, 2020. On that day, her mother, Stephanie, was at work and Sohn was her babysitter. Sohn, Laina, and Laina's brother went for a walk. As they walked, Laina noticed a car driving past several times. She first noticed the car early in the walk. Her Life360 application indicated they left the home at 10:54 a.m. Laina testified the car appeared to be the same car she saw on May 16. Laina explained the route they walked and noted they turned around on Breckenridge Drive to head home. The car had driven past them around five to six times. As the car passed again, Laina used her cellphone to take a photograph of the back of the car with its license plate visible. She sent the picture to Sohn's cellphone. Laina also testified she had the Life360 application on her cellphone. The application provided multiple small maps depicting their walk on May 19. Laina testified each map accurately depicted her walk. The application indicated Laina left home at 10:54 a.m. and arrived home at 11:48 a.m. When Stephanie arrived home from work, Laina showed her the photograph and sent the photograph to Stephanie's cellphone. On May 20, 2020, Stephanie asked Laina to screenshot the photograph with the time she took the photograph visible. Laina did so.

¶ 26    Sohn testified she had just graduated from high school in May 2020. Sohn explained the route they took for the walk on May 19. She noted a small white car kept driving by them. Sohn testified it was difficult to see into the vehicle because its windows were tinted. She could see the only person in the car was the driver, and the driver was a male with his hood up. Sohn looked at the photograph Laina had taken of the car and recognized the first three

letters/numbers of the license plate. The week before, Sohn had noticed a car frequently driving by her and the kids on their walk and its license plate began with the same three numbers/letters. The car was also the same color and type of vehicle.

¶ 27    Audrey testified she and Laina were the only ones outside on May 16 when they were making videos in the front yard of Laina's home. Audrey observed a white car drive past around three times and then told Laina that, if it came back again, they should go inside. The car came back around, and the driver turned all the way back around in his seat and stared at Audrey as he was driving past. Audrey could see the car turning around each time in what she described as a "little circular area." Audrey described the car as white with tinted windows. She saw only a driver in the car, and the driver was wearing a black hoodie and had blond or dirty blond hair. They went inside after the car went by for the fourth time. Audrey told Laina's mother, Stephanie, about the car.

¶ 28    Stephanie testified that, on May 16, 2020, Laina and Audrey were out in the front yard doing flips, making videos, and having a water fight. The girls came in and made a complaint about a car. At that time, Stephanie did nothing further regarding the complaint. Stephanie worked on May 19, 2020, and got home around 3 p.m. At home, she was shown a picture on Laina's cellphone of a car. Later in the evening, Stephanie discussed the car with her husband because it did not sit right with her. Stephanie sent Laina's photograph of the car to her friend Jen Summers, who was married to Officer Summers. On May 20, 2020, she sent Officer Summers the photograph of the car she received from Laina, the screenshot from Laina's phone showing when the photograph was taken, and the Life360 maps for Laina's May 19 walk.

¶ 29    Tony testified his daughter Emily dated defendant. After defendant's arrest, Tony contacted the police department and learned Officer Summers was in charge of the case. Tony

talked with Officer Summers and told him Emily, who was only 17 years old at the time, was available to talk with him. He also offered to provide information from a Life360 application. Tony called Officer Summers several times after that. Officer Summers never took him up on his offers. The state's attorney's office eventually contacted Emily in late 2020.

¶ 30 Emily testified she and defendant had been dating for three or four years. She and defendant had a redbone coonhound, and her family had two golden retrievers. She was not familiar with the area of Acadia Way and Evangeline Drive. Emily testified she had not taken a walk in that area with defendant and had never used the walkway from Evangeline Road and the subdivision to the north. She also testified she never received a call from Officer Summers.

¶ 31 Shaun, defendant's mother, testified she did the laundry and defendant did not have a red hoodie sweatshirt. She also testified she was working on May 16 as a hairdresser. Shaun drove the Impala to work that day. She worked from 9 a.m. to 5 p.m. and could see the Impala as she worked. The Impala was there the entire time she worked. Moreover, defendant's cellphone was at home with her when defendant went to the police station on May 20. No one from the Quincy Police Department ever asked to see defendant's cellphone. Shaun also testified defendant "very rarely" walked their two dogs and noted their dogs were not capable of walking a roundtrip of 2.6 miles.

¶ 32 During the jury instruction conference, defense counsel objected to the State's request for Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.14), which addresses other-conduct evidence. Defense counsel asserted the State's evidence did not tie defendant to the white car seen by Laina. The court allowed the jury instruction over defense counsel's objection. The jury received the following instruction:

"Evidence has been received that the Defendant has been involved in conduct other than that charged in the indictment. This evidence has been received on the issue of the Defendant's identification and may be considered by you only for that limited purpose. It is for you to determine whether the Defendant was involved in that conduct and, if so, what weight should be given to this evidence on the issue of Defendant's identification."

¶ 33 At the conclusion of the trial, the jury found defendant guilty of all three counts. Defendant filed a posttrial motion, asserting, *inter alia*, the circuit court erred by allowing other-conduct evidence, the identification of defendant by one of the victim's was unduly suggestive, and the verdict was against the manifest weight of the evidence. Defendant amended the posttrial motion to also argue the court erred in its ruling requiring defendant to testify to lay the foundation for defendant's Life360 information. On May 5, 2021, the trial court held a joint hearing on defendant's posttrial motion and sentencing. The court denied defendant's motion and sentenced him to 30 months' probation.

¶ 34 On May 12, 2021, defendant filed a timely notice of appeal in sufficient compliance with Illinois Supreme Court Rule 606 (eff. Mar. 12, 2021). Accordingly, this court has jurisdiction of defendant's appeal under Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013).

¶ 35                              II. ANALYSIS

¶ 36                    A. Admissibility of Other-Conduct Evidence

¶ 37 Defendant contends the trial court erred by admitting other-conduct evidence. Defendant acknowledges he did not preserve the issue for appellate review. He asks us to review the matter under the plain-error doctrine (Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)) and asserts his trial counsel was ineffective for failing to object to the evidence at trial. The State contends

defendant cannot establish plain error or ineffective assistance of counsel for failing to raise the issue.

¶ 38                                    1. *Plain Error*

¶ 39        The plain-error doctrine permits a reviewing court to consider unpreserved error under the following two scenarios:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1058 (2010).

We begin a plain-error analysis by first determining whether any error occurred at all. *Sargent*, 239 Ill. 2d at 189, 940 N.E.2d at 1059. If error did occur, this court then considers whether either of the two prongs of the plain-error doctrine has been satisfied. *Sargent*, 239 Ill. 2d at 189 90, 940 N.E.2d at 1059. "Under both prongs of the plain-error doctrine, the defendant has the burden of persuasion." *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1187 (2010). If the defendant fails to meet his or her burden of persuasion, the reviewing court applies the procedural default. *Hillier*, 237 Ill. 2d at 545, 931 N.E.2d at 1187. Accordingly, we address whether the other-conduct evidence was admissible.

¶ 40        Regarding the admissibility of other-crimes evidence, our supreme court has stated the following:

> "Evidence of other crimes is admissible if it is relevant for any purpose

other than to show the defendant's propensity to commit crime. [Citation.]

Other-crimes evidence is admissible to show *modus operandi*, intent, motive,

identity, or absence of mistake with respect to the crime with which the defendant

is charged. [Citation.] However, even where relevant, the evidence should not be

admitted if its probative value is substantially outweighed by its prejudicial

effect." *People v. Pikes*, 2013 IL 115171, ¶ 11, 998 N.E.2d 1247.

As such, the trial court must weigh the relevance of the evidence to establish the purpose for which it is offered against the prejudicial effect of such evidence against defendant. *Pikes*, 2013 IL 115171, ¶ 13. Similarly, Illinois "Rule of Evidence 404(b) (Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)) provides that, with certain specified exceptions, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." *Pikes*, 2013 IL 115171, ¶ 14. The rule recognizes other-acts evidence may be admissible for purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011).

¶ 41        This court reviews a trial court's ruling on a motion to admit other-conduct evidence for an abuse of discretion. *People v. Peterson*, 2017 IL 120331, ¶ 125, 106 N.E.3d 944. As such, the question is not whether this court would have made the same decision if it were acting as the trial court, but rather, "whether the trial court's decision is 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' " *Peterson*, 2017 IL 120331, ¶ 125 (quoting *People v. McDonald*, 2016 IL 118882, ¶ 32, 77 N.E.3d 26). "The abuse-of-discretion standard of review is highly deferential." *Peterson*, 2017 IL 120331, ¶ 125.

¶ 42        When the State seeks admission of other-crimes evidence, it must first show a crime took place and the defendant committed it or participated in its commission. *Pikes*, 2013

IL 115171, ¶ 15. Proof the defendant committed the crime or participated in it need not be beyond a reasonable doubt but must be more than a mere suspicion. *People v. Thingvold*, 145 Ill. 2d 441, 456, 584 N.E.2d 89, 95 (1991). This case involves other-conduct evidence, not other-crimes evidence, but the aforementioned principles are the same. The State presented evidence of a white car frequently driving past minor children, who were not the victims in this case, on May 16 and 19, 2020. Defendant first contends the other-conduct evidence was inadmissible because the State did not show he was the person driving the white car on May 16, 2020. However, Laina testified the car she saw on May 19, 2020, appeared to be the same car she saw on May 16, 2020. The white car Laina saw on May 19, 2020, was found to belong to defendant's mother based on the license plate number recorded by Laina with the camera on her cellphone. The State also presented additional evidence the white cars were the same. Laina described the white car on May 16, 2020, as small with tinted windows and the driver as wearing a hoodie. Sohn testified the white car on May 19, 2020, was small with "darker" windows and the driver was wearing a hoodie with the hood up. Thus, the State did present evidence sufficiently linking defendant to the white car seen on May 16, 2020, and we find the other-conduct evidence was relevant to the identity of the person who committed sexual exploitation of a child on May 19, 2020.

¶ 43    Defendant argues that, even if the other-conduct evidence was relevant, the evidence is prejudicial because the State improperly created a "mini-trial." Our supreme court has advised against conducting mini-trials on other conduct. *People v. Brown*, 319 Ill. App. 3d 89, 96, 745 N.E.2d 173, 181 (2001) (citing *People v. McKibbins*, 96 Ill. 2d 176, 186-87, 449 N.E.2d 821, 826 (1983)). As such, trial courts are to "carefully limit evidence of other conduct to evidence relevant to the issue on which the other conduct is admitted." *Brown*, 319 Ill. App.

3d at 96, 745 N.E.2d at 181. This court has recognized "[c]umulative evidence of other conduct can overpersuade the jury to convict the defendant as a bad person, rather than because he was guilty of the crime charged." *Brown*, 319 Ill. App. 3d at 96, 745 N.E.2d at 181. Defendant claims the State called three witnesses to testify about each incident when only one would have sufficed. We disagree.

¶ 44    It was Audrey who was the older minor and made the decision for her and Laina to go inside Laina's home on May 16 due to the white car frequently driving by and looking at them. Laina was the one who observed what she believed was the same white car three days later on May 19 and took a photograph of the car. Stephanie, Laina's mother, forwarded the photograph taken by Laina to Officer Summers's wife, which led to defendant becoming a suspect. Sohn, Laina's babysitter, was older and herself took notice of a white car frequently driving by and observed the driver had the hood of a hoodie up. Thus, we disagree with defendant's assertion only one of the witnesses would have been adequate. While some of the evidence was repetitive, most of it was not and showed how the police determined defendant was a suspect. Moreover, the aforementioned witnesses were 4 of the State's 16 witnesses, and the photograph of the car with and without a timestamp and Laina's Life360 maps were the only exhibits pertaining to the other-conduct evidence.

¶ 45    The aforementioned facts are distinguishable from the cases cited by defendant. In *Brown*, 319 Ill. App. 3d at 97, 745 N.E.2d at 181, this court found the State switched the focus of the trial to the prior incident. There, the testimony of 4 of the State's 12 witnesses focused solely on the prior incident. *Brown*, 319 Ill. App. 3d at 97, 745 N.E.2d at 181. The testimony of two other witnesses discussed both the prior incident and the incident at issue, resulting in half the State's witnesses testifying about the prior incident. *Brown*, 319 Ill. App. 3d at 97, 745

N.E.2d at 181. Additionally, much of the testimony about the prior incident was repetitive. *Brown*, 319 Ill. App. 3d at 97, 745 N.E.2d at 181. In *People v. Nunley*, 271 Ill. App. 3d 427, 432, 648 N.E.2d 1015, 1018-19 (1995), the reviewing court found the detailed and repetitive manner in which the State's evidence was presented greatly exceeded what was required to accomplish the purpose of showing the voluntariness of the defendant's confession and subjected the defendant to a mini-trial over conduct far more grotesque than that for which he was on trial. In *People v. Bedoya*, 325 Ill. App. 3d 926, 940, 758 N.E.2d 366, 379 (2001), the State presented 7 witnesses, introduced 22 photographs, and admitted bullets and bullet casings as exhibits, all regarding previous shootings. Here, only some of the evidence was repetitive and, as explained, each witness provided additional detail. Moreover, the behavior exhibited by defendant on May 16 and 19 was not more egregious or grotesque than the behavior for which defendant was charged.

¶ 46 Accordingly, we find the State's evidence did not constitute a mini-trial on defendant's other conduct.

¶ 47 Additionally, defendant notes the prejudicial effect of the other-conduct evidence because, as argued by the State in closing arguments, the evidence shows "creeping behavior" against children, which risked inflaming the jury's passion. The trial court had the responsibility of weighing the relevance of the other-conduct evidence against its prejudicial effect on defendant. The other-conduct evidence on May 19 was very close in time to the charged incident and led to defendant becoming a suspect in this case. The May 16 other-conduct evidence explained Laina's heightened awareness on May 19 and why she would have taken a photograph. While defendant's behavior on May 16 and 19 was odd, it was not criminal. Accordingly, the trial court's decision the relevancy of the other-conduct evidence was not

substantially outweighed by its prejudicial effect is not arbitrary, fanciful, or unreasonable. Since we have found no error, we do not address plain error.

¶ 48                    2. *Ineffective Assistance of Counsel*

¶ 49        In addition to arguing plain error, defendant argues defense counsel was ineffective for failing to object to the other-conduct evidence and for failing to request IPI Criminal No. 3.14 before the State introduced the other-conduct evidence.

¶ 50        This court analyzes ineffective assistance of counsel claims under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Evans*, 186 Ill. 2d 83, 93, 708 N.E.2d 1158, 1163 (1999). To obtain relief under *Strickland*, a defendant must prove (1) his counsel's performance failed to meet an objective standard of competence and (2) counsel's deficient performance resulted in prejudice to the defendant. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163-64. To satisfy the deficiency prong of *Strickland*, the defendant must demonstrate counsel made errors so serious and counsel's performance was so deficient that counsel was not functioning as "counsel" guaranteed by the sixth amendment (U.S. Const., amend. VI). *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163. Further, the defendant must overcome the strong presumption the challenged action or inaction could have been the product of sound trial strategy. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163. To satisfy the prejudice prong, the defendant must prove a reasonable probability exists that, but for counsel's unprofessional errors, the proceeding's result would have been different. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163-64. As with any ineffective-assistance-of-counsel claim, we may begin our analysis by addressing the prejudice prong. See *Strickland*, 466 U.S. at 697.

¶ 51                         a. Admissibility

¶ 52        Defendant's assertion of ineffective assistance of counsel related to counsel's

failure to object to the other-conduct evidence when it was introduced can be disposed of by addressing the "prejudice" prong. We have concluded the trial court did not err by admitting other-conduct evidence. Thus, if defendant's trial counsel had objected to the other-conduct evidence, "the result would have been no different than the effect of his failure to do so." *People v. Caffey*, 205 Ill. 2d 52, 106, 792 N.E.2d 1163, 1197 (2001). As such, the purported ineffective assistance of his trial counsel did not prejudice defendant, and he cannot establish the prejudice prong of the *Strickland* test. See *Caffey*, 205 Ill. 2d at 106, 792 N.E.2d at 1197 (2001).

¶ 53                                    b. Jury Instruction

¶ 54          As to defendant's claim related to IPI Criminal No. 3.14, the State asserts defense counsel's failure to request the instruction before the State presented other-conduct evidence was trial strategy, and defense counsel's objection to the instruction during the jury instruction conference was not prejudicial because the trial court gave the instruction over the objection. We agree with the State.

¶ 55          First, the jury did receive IPI Criminal No. 3.14 at the end of trial. While defense counsel did object to the instruction, defendant cannot establish prejudice from that objection because the trial court overruled the objection. See *Caffey*, 205 Ill. 2d at 106, 792 N.E.2d at 1197 (recognizing the defendant does not suffer prejudice where, if trial counsel had acted as the defendant suggested, "the result would have been no different than the effect of trial counsel's failure to do so"). As to the giving IPI Criminal No. 3.14 before the presentation of the evidence, defendant points out the Committee Note for IPI Criminal No. 3.14 states the following:

> "At the time the evidence which is the subject of this instruction is first presented to the jury, the Committee recommends that an oral instruction should be given to explain to the jury the limited purpose of this evidence, *unless the*

*defendant objects to that instruction.*"  (Emphasis added.)  IPI Criminal No. 3.14,

Committee Note (approved Oct. 17, 2014).

Thus, the Committee Note for IPI Criminal No. 3.14 legitimizes a defense trial strategy of not

having the instruction read before the presentation of other-conduct evidence.  The instruction

does not mention until the third paragraph of IPI Criminal No. 3.14 that the jury is to determine

whether the defendant was in fact involved in the conduct he has been alleged to have done.

Thus, the jury may not understand its role when receiving the instruction orally.  Further, the

record is clear defense counsel's strategy was defendant was not driving the white car seen by

Laina on May 16 and May 19 and, as such, the State's alleged other-conduct evidence was not

committed by defendant.  Defense counsel believed the State's evidence did not in any way

connect defendant to the white car seen by Laina.  Accordingly, we find defendant fails to

overcome the strong presumption of trial strategy and cannot establish the deficiency prong of

the *Strickland* test.

¶ 56                                              B. Life360 Map

¶ 57            Defendant next argues the trial court erred by not allowing him to introduce his

Life360 map from May 19, when it could be authenticated by several people other than him.

However, defendant never made an offer of proof.  "If a criminal defendant claims on appeal that

he was not able to prove his case because the trial court improperly barred him from presenting

evidence but he failed to make an adequate offer of proof, he forfeits review of the issue on

appeal."  *People v. Boston*, 2016 IL App (1st) 133497, ¶ 64, 54 N.E.3d 217.  In the alternative,

defendant asserts his counsel was ineffective for failing to ask the trial judge to reconsider a prior

judge's ruling on the admissibility of the Life360 map and for not laying a foundation at trial for

defendant's Life360 map.

¶ 58　　　　　　With this claim, defendant cannot establish the prejudice prong of the *Strickland* test.  As recognized in *People v. French*, 2017 IL App (1st) 141815, ¶ 85, 72 N.E.3d 1214, GPS records connected to a defendant's cellphone only show the location of the cellphone and not necessarily a defendant's location.  *French*, 2017 IL App (1st) 141815, ¶ 85.  Thus, the defendant's testimony would have been necessary to support the GPS records to tie the defendant's location to the location of the cellphone at the time of the crime.  See *French*, 2017 IL App (1st) 141815, ¶ 85.  Defendant contends the perpetrator of the crime showed the girls a picture of a dog on a cellphone, and thus defendant did not leave his cellphone behind if he was the perpetrator.  However, defendant could have shown the girls the picture on a different cellphone that is not his cellphone connected to Life360.  Defendant does not suggest he was with another person the entire period for which the GPS evidence purportedly covered, and thus he is the only one who can state "the matter in question is what its proponent claims."  Ill. R. Evid. 901(a) (eff. Sept. 17, 2019).  We note Officer Summers could only verify defendant's location from 6 to 10:40 a.m.  Accordingly, even if defense counsel sought reconsideration of the motion *in limine* and presented an offer of proof, the results would have been the same.

¶ 59　　　　　　　　　　　　C. Sufficiency of the Evidence

¶ 60　　　　　　Defendant further  contends the State's evidence was insufficient to prove beyond a reasonable doubt he was the person who committed the offense of sexual exploitation of a child on May 19, 2020.  The State disagrees.  A defendant may raise a challenge to the sufficiency of the evidence for the first time on appeal.  *People v. Carter*, 2021 IL 125954, ¶ 41, 190 N.E.3d 224.  Our supreme court has set forth the following standard of review for insufficiency of the evidence claims:

　　　　　　　　　"It is well settled that, when reviewing a challenge to the sufficiency of the

- 22 -

evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] All reasonable inferences from the evidence must be drawn in favor of the prosecution. [Citation.] This court will not reverse the trial court's judgment unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *People v. Cline*, 2022 IL 126383, ¶ 25.

¶ 61 Regarding eyewitness identification, our supreme court has recognized that, while a single witness's identification that is vague and doubtful is insufficient to sustain a conviction, a single witness's identification will be "sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *People v. Lewis*, 165 Ill. 2d 305, 356, 651 N.E.2d 72, 96 (1995). In assessing the reliability of identification testimony, Illinois courts have relied upon the factors set forth by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199 (1972). *People v. Piatkowski*, 225 Ill. 2d 551, 567, 870 N.E.2d 403, 412 (2007). Those factors include "(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation." *Piatkowski*, 225 Ill. 2d at 567, 870 N.E.2d at 412. No single factor is dispositive, and the identification's reliability is based on the totality of the circumstances. *Biggers*, 409 U.S. at 199. Our supreme court has also considered "whether the witness was acquainted with the suspect before the crime, and whether there was any pressure on the witness to make a certain identification." *People v.*

*Brooks*, 187 Ill. 2d 91, 130, 718 N.E.2d 88, 110 (1999). We note the *Biggers* factors are contained in Illinois Pattern Jury Instructions, Criminal, No. 3.15 (approved June 28, 2017), and defendant did not request that jury instruction be given.

¶ 62 Defendant argues the first two factors detract from the strength of A.E.T's identification. A.E.T. testified the driver of the white car pulled up and rolled down his window. A.E.T. observed the car was small and white, and no one else was in it. She also observed the driver's hair. The driver asked her to look at a picture of his dog on his cellphone, and A.E.T. did look at the picture. The driver returned again and rolled down his window. This time A.E.T. was standing a little bit behind E.M.E. who was taller than her. A.E.T. did not see the driver's penis. While A.E.T.'s encounters were somewhat brief, she also told her mother she had seen the man in the neighborhood before walking two dogs with a girl around his age. A.E.T. stated she also recognized the dog in the photograph as walking with defendant in the neighborhood, and she described it as a beagle. In his interview, defendant spontaneously volunteered he had a beagle that resided with his girlfriend. Thus, given A.E.T. had recognized defendant from his walks in the neighborhood, we do not find the brief encounters detract from the strength of her identification.

¶ 63 As to the third factor, we disagree with defendant A.E.T.'s description of the driver renders her identification unreliable. A.E.T. testified the driver of the white car had blond hair that was "bald in the middle and then like hair on the sides." In the photograph of defendant presented to the jury, defendant had unique hair. His hair was light blond, parted in the middle, straight on top, and then became curly half-way down his head. As to length, defendant's hair was longer than chin length but not shoulder length. A jury could find A.E.T.'s description of the driver was consistent with defendant's appearance.

- 24 -

¶ 64        Regarding the fourth and fifth factors, A.E.T. identified defendant in a photograph on a computer screen within a few days of the incident and was definitive in her identification of him.  Defendant notes the computer screen stated in big letters "QUINCY ARREST" and defendant's name under his photograph.  However, A.E.T. did not know defendant's name and did not recall seeing words on the computer screen.  A.E.T. did make the identification of defendant in response to her mother's question, which does detract from reliability.  However, beyond the identification coming after a question, no evidence was presented A.E.T. was pressured to make an identification.

¶ 65        Based on the *Biggers* factors, we do not find A.E.T.'s identification was unreliable.  Regardless, we agree with the State additional identification evidence was presented.

¶ 66        All three victims provided a description of the individual who touched his penis in front of them on May 19, 2020.  E.M.E. testified the man was a teenager and his yellowish hair went straight up and was curly.  She described his clothing as jeans and a red sweatshirt with a hood.  E.M.E recalled seeing him walking with a girl and a dog on one occasion in her neighborhood.  R.P.E. described a man with blondish hair wearing a red hoodie sweatshirt.  E.M.E. and R.P.E.'s father testified they told him the driver was a white teenage boy with some freckles and hair that was a little bit longer and curly at the ends but kind of thin at the top.  A.E.T.'s mother testified A.E.T. told her the guy had longer blondish hair, always wore a hat, and would walk two dogs in the neighborhood with a girl.

¶ 67        The jury was able to view defendant's appearance on the morning of the incident in the surveillance video at County Market.  It also observed defendant's appearance the day after the incident on the video recording of the police's interview of defendant and the screenshot of the computer screen that A.E.T. viewed and identified defendant as the driver of the white car.

The jury then had the task of considering the young girls' description of the driver of the white car and defendant's appearance. As stated, defendant had unique hair. The girls' description of the driver could be found to describe defendant's appearance.

¶ 68 Moreover, A.E.T. described the man as always wearing a hat, and defendant was seen in both the County Market surveillance video and the interview video wearing a hat. Defendant, who was 18 years old in May 2020, owned a dog with his girlfriend. Both his family and his girlfriend's family possessed other dogs. The only description of defendant that was questionable was the color of his hoodie sweatshirt. Evidence was presented defendant was wearing a black hoodie sweatshirt at work on the morning of the incident and not a red hoodie sweatshirt. It is possible defendant changed sweatshirts or the girls were mistaken about the color of the sweatshirt.

¶ 69 Additionally, the incident took place around 11 a.m., and Laina took a picture at 11:28 a.m. of the car defendant admitted he was driving that morning. The car was a white Chevrolet Impala, which is a four-door sedan car. Laina was in the same general area of Quincy as the three girls and had taken the photograph after the car had driven past her several times, as she took a walk with her babysitter. The babysitter noted the driver of the car had a "hood up." Both E.M.E. and R.P.E. noted the driver of the white car was wearing a hoodie sweatshirt. Given the close proximity in time and area of the two events, the similarities in the vehicle descriptions, and the driver wearing the same type of top, we find sufficient similarities for Laina's testimony to be circumstantial evidence of defendant's guilt.

¶ 70 Further, "[a] false exculpatory statement is probative of a defendant's consciousness of guilt." (Internal quotation marks omitted.) *People v. Milka*, 211 Ill. 2d 150, 181, 810 N.E.2d 33, 51 (2004). Our supreme court has recognized a false alibi can be a factor in

establishing a defendant's guilt beyond a reasonable doubt. *Milka*, 211 Ill. 2d at 182, 810 N.E.2d at 51. Here, defendant multiple times during the interview with the police stated he worked from 6 a.m. to 12 p.m. the morning of the incident. Specifically, he explained he was a merchandiser and stocked shelves at Wal-Mart from 6 a.m. to 9 a.m., County Market from 9 a.m. to 10:45 a.m., and Hy-Vee on Broadway Street from 10:45 a.m. to 12 p.m. Defendant used his mother's car to get from store to store. He used Broadway and Main Streets in between stores and did not go through any subdivisions. The State presented ample evidence showing defendant did not go to work at Hy-Vee on the day of the incident and stopped working at 10:40 a.m. This false alibi provided additional circumstantial evidence of defendant's guilt.

¶ 71         We find the aforementioned identification and circumstantial evidence sufficient for the jury to find beyond a reasonable doubt defendant was the driver who exposed his penis to the three girls.

¶ 72                                    III. CONCLUSION

¶ 73         For the reasons stated, we affirm the Adams County circuit court's judgment.

¶ 74         Affirmed.